## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CYRIL MADUKWE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 07-775-GMS-LPS |
| | : | |
| DELAWARE STATE UNIVERSITY, et al., | : | |
| | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| ANGELE A. OZOEMELAM, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 07-804-SLR-LPS |
| | : | |
| DELAWARE STATE UNIVERSITY, et al., | : | |
| | : | |
| | : | |
| Defendants. | : | |

Noel E. Primos, SCHMITTINGER & RODRIGUEZ, P.A., Dover, DE, Attorney for Plaintiffs.

Kathleen Furey McDonough, Sarah E. DiLuzio, POTTER ANDERSON & CORROON, LLP, Wilmington, DE, Attorneys for Defendants Delaware State University, Allen Sessoms, Mark Farley, Donald Henry, Carolyn Curry, and Penelope Howe.

Marc S. Casarino, WHITE & WILLIAMS, LLP, Wilmington, DE, Attorney for Defendants Financial Aid Services Inc. and Darylann Thomas.

### MEMORANDUM OPINION

May 5, 2008
Wilmington, Delaware

**STARK, U.S. Magistrate Judge:**

## I.  INTRODUCTION

These actions arise out of alleged employment discrimination on the basis of sex and/or

race and national origin by Defendant Delaware State University ("DSU" or "the University"),

and one or more individual defendants (who together with DSU will be referred to hereinafter as

"the Defendants"), all of whom are high-ranking officials of the University.[1]  Plaintiffs Angele A.

Ozoemelam and Cyril Madukwe (together hereinafter referred to as "Plaintiffs") each allege

violations under Title VII and 42 U.S.C. §§ 1981 and 1983 as well as breach of contract.[2]  In

general, both Plaintiffs claim that DSU harassed them, denied them promotions and/or

compensation, terminated their employment, and refused to afford them the due process to which

they were entitled.

Plaintiffs are each represented in these cases by Noel E. Primos of the law firm of

Schmittinger & Rodriguez, P.A. ("S&R" or "the firm").  However, for more than a quarter of a

century, S&R attorneys – including, at times, Primos – formerly represented DSU, including by

defending the University against employment discrimination allegations exactly like those now

pressed by Plaintiffs.  Asserting that S&R's representation of Plaintiffs constitutes a conflict of

---

[1]The individual defendants, who are sued in their individual and official capacities, are: Allen Sessoms, President of the University; (ii) Mark Farley, Vice President for Human Resources and Legislative Affairs; (iii) Donald Henry, Vice President for Business and Finance; (iv) Carolyn Curry, Vice President for Institutional Advancement; and (v) Penelope Howe, Assistant Vice President for Business and Finance.  Plaintiff Madukwe has also filed suit against Financial Aid Services, Inc. ("FAS") and Darylann Thomas, DSU's Interim Assistant Vice President for Enrollment Services, in her individual and official capacity.  FAS and Thomas have not joined the other Defendants' motions to disqualify.

[2]Ozoemelam also alleges breach of the covenant of good faith and fair dealing; Madukwe also alleges tortious interference with contract and slander.

interest, Defendants have moved to disqualify S&R ("the Motions").[3]

Although these cases are not consolidated, the parties agree that the same analysis applies
to both Motions. For the following reasons, the Court will grant Defendants' Motions to
disqualify S&R from representing either of the Plaintiffs.

## II. BACKGROUND

### A.   S&R's Representation Of DSU

It is undisputed that S&R represented DSU as outside counsel from at least 1980 until
October 2005. Near the start of this relationship, S&R attorney Nicholas H. Rodriguez argued on
behalf of the University before the United States Supreme Court in the case of *Delaware State
College v. Ricks*, 449 U.S. 250 (1980), involving a professor's claim that he had been denied
tenure in violation of Title VII. Over the course of the ensuing, lengthy attorney-client
relationship, S&R generally, and S&R attorneys Rodriguez, Primos, and Catherine T. Hickey,
specifically, represented the University in numerous employment and labor matters. An October
2004 letter from S&R's Hickey to DSU explained that, other than collective bargaining
agreement negotiations, "[o]ver the long course of our representation of the University, we have
handled all other 'labor' matters . . . [including] grievance arbitrations, unfair labor practice
proceedings, and discrimination complaints which are not handled by University employees."
CA 775, D.I. 39 at Ex. B; CA 804, D.I. 22 at Ex. B.

Thus, in its briefing, as well as in attached audit letters drafted by S&R for DSU, the
University identifies at least ten employment-related matters in which S&R represented DSU.

---

[3]These cases were referred to the undersigned Magistrate Judge by orders dated March
14, 2008 (Case No. 07-775-GMS-LPS (hereinafter "CA 775"), D.I. 43) and February 11, 2008
(Case No. 07-804-SLR-LPS (hereinafter "CA 804"), D.I. 14).

*See, e.g.*, CA 775, D.I. 20 at 2 n.2; D.I. 21 at Exs. B, C; D.I. 51 at 64-66; CA 804, D.I. 9 at 2 n.2; D.I. 10 at Exs. B, C; D.I. 33 at 64-66. Primos acknowledges that he worked on at least four of these matters on behalf of DSU. CA 775, D.I. 51 at 64-65; CA 804, D.I. 33 at 64-65. While none of these cases involved either of the current Plaintiffs, Primos agreed with the characterization that "at a legal level" the matters on which S&R represented DSU were "entirely identical" to those now presented by these Plaintiffs. CA 775, D.I. 51 at 52; CA 804, D.I. 33 at 52.

S&R attorneys at times participated in the drafting, revision, and interpretation of DSU staff personnel policies. In 1995, Hickey helped draft the University's Professional Employee Handbook (the "Handbook"), which outlines the terms and conditions of employment for the University's non-faculty, non-union staff. Primos' billing records from 1995 show that he, too, worked on revising the Handbook, although for only about a half an hour. *See* CA 775, D.I. 21 at ¶¶ 6-7; D.I. 32 at ¶ 5 & Ex. A; D.I. 51 at 47; CA 804, D.I. 10 at ¶¶ 6-7; D.I. 16 at ¶ 5 & Ex. A; D.I. 33 at 47.

S&R was during some periods the exclusive outside counsel for the University. CA 775, D.I. 51 at 51; CA 804, D.I. 33 at 51. Given the breadth, scope, and length of the attorney-client relationship, it is unsurprising that, as recently as September 2004, DSU provided S&R's Rodriguez and Hickey a document outlining the University's Risk Management Strategies. *See* CA 775, D.I. 39 at Ex. B; CA 804, D.I. 22 at Ex. B.

Hickey appears to have been the primary outside attorney representing DSU between at least 1991 and her retirement from S&R on March 31, 2005. Primos, who began performing work for DSU by 1992, became DSU's main point of contact at S&R upon Hickey's departure

3

from the firm. A February 2005 letter from Hickey to the University's Board of Trustees observed that Primos had "handled many Delaware State University matters over the past several years" and was "experienced and capable in any area for which the University would seek representation. CA 775, D.I. 39 at Ex. C; CA 804, D.I. 22 at Ex. C. Hickey further assured the Board that Mark Farley, DSU Vice President for Human Resources and Legislative Affairs, "knows Mr. Primos and has worked with him in the past." *Id.*

B.    Termination Of DSU-S&R Attorney-Client Relationship

DSU's use of S&R's legal services appears to have begun to decline after the University hired a new president in October 2003. *See, e.g.,* CA 775, D.I. 32 at ¶ 7; CA 804, D.I. 16 at ¶ 7. The reduction in services continued as DSU hired Vice President Farley in February 2004. *Id.* The relationship appears to have been adversely affected again when Hickey left S&R in March 2005. *See, e.g.,* CA 775, D.I. 32 at ¶ 8; CA 804, D.I. 16 at ¶ 8.

By letter dated April 29, 2005, Vice President Farley informed S&R's Primos that the University would henceforth be using other attorneys for "some" of its legal issues. CA 775, D.I. 32 at Ex. C; CA 804, D.I. 16 at Ex. C. Farley added that he hoped he might continue to call upon Primos and S&R from time to time in the future. *Id.* While the attorney-client relationship largely ended at this point, Primos continued to perform some work for DSU until October 20, 2005. *See* CA 775, D.I. 51 at 10-11; D.I. 21 at ¶ 2; D.I. 32 at Ex. E; CA 804, D.I. 33 at 10-11; D.I. 10 at ¶ 2; D.I. 16 at Ex. E.

C.    Plaintiffs' Complaints Against DSU And The Individual Defendants

In her complaint, Plaintiff Ozoemelam alleges that in January or February 2005, she applied for the position of Associate Vice President for Business and Finance. She interviewed

4

with the University in March 2005. Ozoemelam complains that instead of being offered the position for which she had applied, DSU decided not to fill that position but instead to hire two Assistant Vice Presidents for Business and Finance. She accepted one of the Assistant Vice President positions. But, on September 26, 2006, she was terminated.

Plaintiff Madukwe was hired by the University in 1986 as a trades helper. After furthering his education, beginning in 1995 Madukwe was employed as a financial aid officer, under a series of one-year contracts the University renewed based on his performance. Under his final contract, effective July 1, 2006 through June 30, 2007, Madukwe claims he was denied a promotion and training. He, like Ozoemelam, was terminated on September 26, 2006.

Notably, both Plaintiffs' complaints include allegations that occurred during the time when S&R was representing DSU, including on employment-related matters. In particular, Plaintiff Ozoemelam's allegations of discrimination include claims regarding her March 2005 interview and the University's subsequent decision to hire two Assistant Vice Presidents instead of a single Associate Vice President. CA 804, D.I. 1 at ¶12; D.I. 33 at 17-18. As already noted, DSU's attorney-client relationship with S&R did not end until October 20, 2005.

## D.    DSU Gives S&R Notice Of The Conflict

Shortly after being terminated by the University in late September 2006, each of the Plaintiffs retained S&R. On October 20, 2006, S&R's Rodriguez accompanied Ozoemelam to her initial grievance proceeding at DSU. Just days later, on October 25, 2006, Marc S. Casarino, an outside attorney for DSU, wrote to Rodriguez to state that the University "considers your involvement a conflict of interest pursuant to Delaware Rules of Professional Responsibility 1.6, 1.9, and 1.10." CA 804, D.I. 16 at Ex. D. Casarino continued:

5

> As you know, your firm represented Delaware State University for several recent
> years and actively participated in the drafting, negotiation, and enforcement of
> Delaware State University's professional employees policies and procedures; and
> offered legal counsel to the University with respect thereto. In that capacity your
> firm has been privy to confidential and proprietary information of the University
> related to said policies and procedures.

*Id.* On behalf of the University, Casarino requested "that you voluntarily recuse yourself from

any further involvement with Ms. Ozoemelam." *Id.* The letter concluded by advising Rodriguez

that "should you choose not to recuse yourself the University will take appropriate action to seek

such relief." *Id.*

Casarino had asked for a response from Rodriguez within two days. S&R complied with

this deadline. On October 27, 2006, Rodriguez and Primos wrote to say that S&R "will not be

withdrawing from its representation of Ms. Ozoemelam." CA 804, D.I. 32 at Ex. E. Analyzing

each of the Professional Responsibility Rules that had been cited by DSU, the S&R attorneys

observed that "[n]o lawyer associated with this firm has ever represented the University with

regard to Ms. Ozoemelam's employment or any matter substantially related to her employment."

*Id.* They also stated that the firm did not have and, in any event, would not reveal or use to

DSU's disadvantage any confidential information it may have obtained during its representation

of the University. *Id.* Rodriguez and Primos concluded asking Casarino to "[p]lease let us know

should you have any further questions regarding these issues." *Id.*

On November 2, 2006, Primos and Rodriguez accompanied Madukwe to his initial

grievance procedure at the University. Primos joined Ozoemelam at a further internal DSU

grievance proceeding on December 8, 2006; he joined Madukwe at internal DSU grievance

proceedings on November 28, 2006 and in late February 2007. Also in February 2007, Primos

6

represented Ozoemelam and Madukwe during mediations between Plaintiffs and the University conducted by the Delaware Department of Labor.

Other than the initial exchange of letters in October 2006, there was no further discussion of the University's contention that S&R had a conflict with its representation of Ozoemelam until after Ozoemelam filed her complaint. Pre-litigation, there was never any communication between DSU and S&R regarding what the University now contends is a conflict with S&R's representation of Madukwe.

E.    The University Files Its Motions To Disqualify

Madukwe filed his complaint on November 28, 2007 and served it on the University on December 5, 2007. Ozoemelam filed her complaint on December 11, 2007 and served it on the University on December 21, 2007. The University filed its answers to Madukwe's and Ozoemelam's complaints on December 21, 2007 and January 10, 2008, respectively.

Sometime in January 2008, an attorney for DSU spoke to Primos and said that the University continued to believe that S&R was conflicted in its representation of Ozoemelam. CA 775, D.I. 51 at 36-37; CA 804, D.I. 33 at 36-37. The University's attorney also told Primos, for the first time, that DSU believed the conflict applied to S&R's representation of Madukwe as well. *Id.* Because the University intended to file a motion seeking S&R's disqualification in both actions, the parties essentially agreed to delay scheduling and the start of discovery until the representation issues were resolved. *See* CA 775, D.I. 23; D.I. 51 at 36-37, 71; CA 804, D.I. 11; D.I. 33 at 36-37, 71.

DSU filed its motion for disqualification in the Madukwe case on January 24, 2008 and in the Ozoemelam case on February 1, 2008. CA 775, D.I. 19; CA 804, D.I. 8. The Court held a

7

hearing on the Motions on April 18, 2008. Supplemental briefing was completed on April 23, 2008.

## III. LEGAL STANDARDS

### A. Disqualification

The Court has the inherent authority to supervise the professional conduct of attorneys appearing before it, including the power to disqualify an attorney from a representation. *See United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980). Motions to disqualify are "generally disfavored" and, therefore, require the movant to show clearly that "continued representation would be impermissible." *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F.Supp.2d 510, 513 (D. Del. 2007) (internal quotation marks and citations omitted); *see also Conley v. Chaffinch*, 431 F.Supp.2d 494, 496 (D. Del. 2006) (same). On the other hand, because "[t]he maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important," a court may disqualify an attorney "for failing to avoid even the appearance of impropriety." *Kabi Pharmacia AB v. Alcon Surgical, Inc.*, 803 F. Supp. 957, 960 (D. Del. 1992).

Attorney conduct is governed by the ethical standards of the court before which the attorney appears. *See In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984). The District of Delaware has adopted the Model Rules of Professional Conduct ("M.R.P.C."). *See* D. Del. LR 83.6(d)(2).

8

B.    M.R.P.C. Rule 1.9

Rule 1.9 of the Model Rules of Professional Conduct provides:

A lawyer who has formerly represented a client in a matter shall not thereafter
represent another person in the same or a substantially related matter in which that
person's interests are materially adverse to the interests of the former client unless
the former client gives informed consent, confirmed in writing.

M.R.P.C. Rule 1.9(a).  To determine whether a current matter is "substantially related" to a

matter involved in a former representation, and, thus, whether disqualification under Rule 1.9 is

appropriate, the Court must "undertake a painstaking analysis of the facts" and answer the

following three questions: "(1) What is the nature and scope of the prior representation at issue?

(2) What is the nature of the present lawsuit against the former client? (3) In the course of the

prior representation, might the client have disclosed to his attorney confidences which could be

relevant to the present action?  In particular, could any such confidences be detrimental to the

former client in the current litigation?"  *Satellite Fin. Planning Corp. v. First Nat'l Bank of

Wilmington*, 652 F. Supp. 1281, 1283 (D. Del. 1987) (internal quotation marks and citations

omitted); *see also Talecris*, 491 F.Supp.2d at 514.

As the Third Circuit has explained, M.R.P.C. Rule 1.9 exists for the purpose of

preventing "even the potential that a former client's confidences and secrets may be used against

him," to maintain "public confidence in the integrity of the bar," and to fulfill a client's rightful

expectation of "the loyalty of his attorney in the matter for which he is retained."  *Corn

Derivatives*, 748 F.2d at 162.  Therefore, in attempting to determine whether a "substantial

relationship" exists, "disqualification is proper when the similarity in the two representations is

enough to raise a common-sense inference that what the lawyer learned from his former client

9

will prove useful in his representation of another client whose interests are adverse to those of the

former client." *Cardona v. General Motors Corp.*, 942 F. Supp. 968, 973 (D.N.J. 1996) (internal

quotation marks and citations omitted).  While the party seeking disqualification bears the burden

of establishing the existence of a "substantial relationship," any doubts about whether

disqualification is appropriate should be resolved in favor of the moving party, in order to ensure

protection of client confidences.  *See INA Underwriters v. Nalibotsky*, 594 F. Supp. 1199, 1207

(E.D. Pa. 1984); *see also Buschmeier v. G&G Invs., Inc.*, 2007 WL 4150408, at \*7 (E.D. Pa.

Nov. 19, 2007).

C.    M.R.P.C. Rule 1.10

M.R.P.C. Rule 1.10(a) provides:

> While lawyers are associated in a firm, none of them shall knowingly represent a
> client when any one of them practicing alone would be prohibited from doing so
> by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the
> prohibited lawyer and does not present a significant risk of materially limiting the
> representation of the client by the remaining lawyers in the firm.

M.R.P.C. Rule 1.10(b) applies in circumstances in which a firm is conflicted due to a prior

representation undertaken by an attorney who is no longer associated with the firm.[4]

---

[4]DSU relies on M.R.P.C. Rule 1.10(b) to seek S&R's disqualification as a result of the
work performed by Hickey, a former partner at S&R, who for many years was the lead S&R
attorney working for DSU.  Because I have concluded there are attorneys still working at S&R
who are conflicted under M.R.P.C. Rules 1.9 and 1.10(a), I need not consider the applicability of
M.R.P.C. Rule 1.10(b).

## IV. **DISCUSSION**

A.    Application Of M.R.P.C. Rule 1.9

    1.    The Parties' Positions

Defendants argue that S&R's current representation of Plaintiffs is materially adverse to the University, S&R's former client. They further contend that S&R's present representation of Plaintiffs is substantially related to the matters involved in the firm's former representation of the University and is, therefore, inappropriate under M.R.P.C. Rule 1.9. Specifically, Defendants assert that S&R's prior representation of the University was broad in scope, often involving counseling the University with regard to personnel policies and defending the University against discrimination claims raised by former employees. These included claims that employees had not been treated in a manner consistent with the terms of the Professional Employee Handbook, a manual which Primos (to a very limited extent) participated in drafting. According to Defendants, Primos and S&R have essentially "switched sides" by representing Plaintiffs against DSU in actions that are legally identical to actions for which the firm had previously provided representation to DSU.

Plaintiffs, on the other hand, argue that disqualification is inappropriate because the present matters are not substantially related to S&R's prior representation of the University. To Plaintiffs, the current litigation bears nothing more than a superficial similarity to the matters the firm earlier handled for DSU. They emphasize that at no point during its representation of DSU did S&R advise the University with respect to Ozoemelam or Madukwe or learn any confidential information it could use in the instant cases against the University.

11

2.    Nature And Scope Of Prior And Current Representations

To determine whether disqualification is appropriate under M.R.P.C. Rule 1.9, the Court

must first compare the nature and scope of S&R's prior representation of DSU with the nature of

S&R's current representation of Plaintiffs against DSU.[5]  Based on careful examination of the

factual record, the Court finds that S&R's prior representation of DSU was broad in scope,

encompassing within it representation of the University in employment-related actions involving

legal issues identical to those presented in Plaintiffs' cases.  Just as Plaintiffs press claims of

discrimination based on sex and/or race and national origin, alleging violations under Title VII

and Sections 1981 and 1983, as well as breach of contract and breach of the covenant of good

faith and fair dealing, so, too, has S&R represented the University in defending just these sorts of

claims.  Indeed, S&R concedes this point.  *See, e.g.*, CA 775, D.I. 31 at 10 ("S&R did represent

DSU in a number of employment-related matters, including matters dealing with employment

discrimination and wrongful termination.  This case involves employment discrimination and

wrongful termination."); CA 804, D.I. 15 at 10 (same); *see also* CA 775, D.I. 51 at 52; CA 804,

D.I. 33 at 52.

S&R points out that there is no blanket prohibition on a firm that formerly defended a

client against a type of action thereafter representing new clients against the former client in

actions of that same type.  In this regard, the firm emphasizes comment 2 to M.R.P.C. 1.9, which

states: "a lawyer who recurrently handled a type of problem for a former client is not precluded

from later representing another client in a factually distinct problem of that type even though the

---

[5]It is undisputed that DSU is a former client of S&R, that the interests of S&R's current
clients are materially adverse to DSU's interests, and that DSU did not consent to S&R's
representation of Plaintiffs.

subsequent representation involves a position adverse to the prior client." Here, however, the

instant matters are not entirely "factually distinct" from the matters for which S&R formerly

provided DSU representation. This is first because some of the alleged discrimination claimed

by Plaintiffs occurred during a time S&R was representing the University on many or all of its

labor matters. For example, Plaintiff Ozoemelam's allegations of discrimination involve an

interview process and hiring decision occurring between January and March 2005; S&R's

representation of DSU continued until October 2005. Second, in evaluating Plaintiffs'

employment discrimination claims, it will be necessary to examine how the University treated

other current and former employees in similar situations. *See generally Texas Dep't of*

*Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981) (noting that plaintiff in employment

discrimination case must demonstrate similarly situated employees were not treated equally).

Given that S&R's representation of DSU extended for at least 25 years, and ended just a year

before S&R began to represent Plaintiffs, it is quite likely that among the relevant "comparator"

employees will be one or more individuals with respect to whom S&R formerly advised the

University. *See* CA 775, D.I. 21 at ¶ 6 (Vice President Farley declaring, "it was the University's

practice to seek the counsel of Mr. Primos, and before him, other Schmittinger & Rodriguez

attorneys, before involuntarily terminating any employee"); CA 804, D.I. 10 at ¶ 6 (same).[6]

Furthermore, as comment 2 instructs, "[t]he underlying question is whether the lawyer

was so involved in the [prior] matter that the subsequent representation can be justly regarded as

---

[6]While Primos states in his affidavit that "DSU certainly did not seek my counsel prior to each involuntary termination of an employee" (CA 775, D.I. 21 at ¶ 10), nothing in the record contradicts Farley's representation that, as a general practice, DSU consulted with someone at S&R in these situations.

a changing of sides in the matter in question." M.R.P.C. Rule 1.9, cmt. 2; *see also Talecris*, 491 F.Supp.2d at 515. The Court concludes that, in the circumstances presented here – including especially the length and breadth of S&R's representation of DSU, which extended to representing the University in identical types of employment-related litigation shortly before taking on representation of the Plaintiffs *against* the University – S&R can be regarded as "changing sides." Little more than a year after attorneys from S&R sat next to DSU officials on their side of the table (for consultation, at internal grievance proceedings, mediations, and in court), some of those same attorneys switched to the other side of the table, to face off against their former client.

Thus, the Court finds that the nature and scope of S&R's prior representation of the University and its present representation of Plaintiffs are sufficiently similar to support finding the matters involved here to be substantially related to matters on which the firm previously represented DSU.

3.   Potential For Disclosure Of University Confidences

The next step is to determine whether, in the course of S&R's prior representation of the University, the University might have disclosed confidences to S&R which could be relevant and detrimental to the University in the present action. *See, e.g., Talecris*, 491 F. Supp.2d at 514 (explaining inquiry is whether "confidential information that might have been gained in the first representation [may be] used to the detriment of the former client in the subsequent action") (internal quotation marks and citations omitted). In making this assessment, the Court "should undertake a realistic appraisal of the possibility that confidences had been disclosed in the one matter which will be harmful to the client in the other." *Satellite Fin. Planning*, 652 F. Supp. at

14

1285 (internal quotation marks and citations omitted). It is not necessary for DSU to reveal the specific confidential information it claims S&R obtained. *See* M.R.P.C. Rule 1.9(a), cmt. 3. Instead, "[a] conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services." *Id.*; *see also Webb v. E.I. du Pont de Nemours & Co.*, 811 F. Supp. 158, 162 (D. Del. 1992) ("Courts may assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation without inquiring into their nature and extent.") (internal quotation marks and citations omitted).

The Court concludes that over the more than 25 years that S&R represented DSU in connection with employment-related matters, attorneys at DSU certainly might have learned confidential information about the University that could be used to the University's detriment in the actions brought by Plaintiffs. Vice President Farley states in his affidavit, without contradiction, that he worked with S&R's Hickey and Primos directly to devise defense strategies for specific employment litigation matters. *See* CA 775, D.I. 21 at ¶ 9; CA 804, D.I. 10 at ¶ 10. Farley further states that the University's general practice was to confer with S&R prior to terminating an employee involuntarily. *See* CA 775, D.I. 21 at ¶ 6; CA 804, D.I. 10 at ¶ 6. It requires no stretch of the imagination to conclude that in the course of the numerous employment-related matters on which S&R represented DSU that S&R might have acquired confidential information as to how DSU handles, seeks to avoid, and (failing that) prevails in court with respect to situations precisely like those involved here. *See* CA 775, D.I. 51 at 48-49; CA 804, D.I. 33 at 48-49. Such information could be used by Plaintiffs against the University

15

by, among other ways, helping S&R to shape discovery requests and settlement demands.

Moreover, S&R, including Primos, has knowledge of DSU's decision-making process for hiring, promoting, and terminating, and application of the Handbook to these processes. Plaintiffs are alleging here that the University did not comply with the Handbook's procedural provisions in terminating them. *See* CA 775, D.I. 1 at ¶¶ 33-41, 49-51; D.I. 31 at 14; D.I. 51 at 49; CA 804, D.I. 1 at ¶¶ 35-41, 50-52; D.I. 15 at 14; D.I. 33 at 49. While the University seeks to make much of the fact that Primos helped draft a 1995 revision of the Handbook, the record shows that his involvement was minimal; only .4 hours of billable time can definitively be attributed to this task. *See* C.A. 775, D.I. 32 at ¶ 5, Ex. A; CA 804, D.I. 16 at ¶ 5, Ex. A. It is unclear which provisions he looked at, whether they are at issue in this case, or whether any ambiguity will be asserted with respect to the meaning and adequacy of the terms of the Handbook. Nonetheless, as Vice President Farley has declared, "the University often sought S&R's advice regarding the application of the terms of the Handbook to particular employees and circumstances." C.A. 775, D.I. 21 at ¶ 7; CA 804, D.I. 10 at ¶ 7. The Court concludes that through the course of these multiple consultations S&R came to develop specific knowledge of DSU's interpretation, understanding, and application of its Handbook – knowledge that it could use here to DSU's disadvantage.

Additionally, as recently as September 2004, the University provided S&R's Rodriguez and Hickey a document describing the University's Risk Management Strategies. *See* CA 775, D.I. 39 at Ex. B; CA 804, D.I. 22 at Ex. B.)[7] Knowledge of this type of "playbook information"

---

[7]While Primos may not have seen this document, *see* CA 775, D.I. 32 at ¶ 12; CA 804, D.I. 16 at ¶ 13, it is undisputed that Rodriguez (as well as Hickey) received it.

16

– for example, "what lines of attack to abandon and what lines to pursue, what settlements to

accept and what offers to reject," *Webb*, 811 F. Supp. at 162 – is a basis for disqualification. *See,*

*e.g.*, *Colorpix Systems of America v. Broan Mfg. Co., Inc.*, 131 F.Supp.2d 331, 339-40 (D. Conn.

2001) (granting manufacturer's motion to disqualify insurer's law firm from fire subrogation case

because firm had previously represented manufacturer's parent company in separate fire

subrogation claims, giving firm knowledge of parent's uniform defense strategy); *Cardona*, 942

F. Supp. at 972-73 (disqualifying plaintiff's outside attorney in "lemon law" action because that

attorney had previously defended an automobile manufacturer and was thereby aware of former

clients' litigation philosophy as well as methods and procedures for defending claims); *Webb*,

811 F. Supp. at 162 (disqualifying ERISA plaintiff's attorney from representation against du Pont

where that attorney had previously worked in-house defending du Pont against same type of

ERISA actions).  While comment 3 to M.R.P.C. Rule 1.9 states that "general knowledge of the

client's policies and practices ordinarily will not preclude a subsequent representation," in the

circumstances of the instant case the Court concludes that DSU's risk management strategies are

"specific facts gained in a prior representation that are relevant to the [instant] matter," which the

same comment indicates supports disqualification.

    Furthermore, S&R still has the client files it accumulated over the course of its lengthy

representation of the University. *See, e.g.*, CA 775, D.I. 51 at 21, 53-54; CA 804, D.I. 33 at 21,

53-54.  According to the University, these files "contain general risk management strategies,

specific defense strategies, personnel policy drafts and countless other internal University

decision-making processes that the University desired to share with its long-time counsel."  CA

775, D.I. 38 at 2; CA 804, D.I. 21 at 2.

17

Plaintiffs suggest that even if S&R obtained any confidential information about DSU's general litigation or risk management strategies, this information would be unhelpful to Plaintiffs because the University may not do things now the same way it used to do them. *See* CA 775, D.I. 31 at 13; CA 804, D.I. 15 at 13. They argue there is a "new regime" in charge at DSU, so any knowledge S&R might have acquired is outdated. In appropriate cases, such claims may prevent disqualification.[8] But the record shows that the changes at the top of the University occurred while S&R was still representing DSU. President Sessoms began his tenure in September 2003 and Farley began in February 2004 – but the attorney-client relationship did not end until October 2005. Hence, even if there was a "new regime" at DSU, S&R worked with that regime for at least 18 months.

In sum, the Court concludes that S&R's representation of Plaintiffs is substantially related to its prior representation of the University. Therefore, pursuant to M.R.P.C. Rule 1.9, disqualification of S&R is appropriate.

B.    Application Of M.R.P.C. Rule 1.10(a)

For the reasons discussed above, Primos and Rodriguez are not permitted to represent Plaintiffs. It follows, under M.R.P.C. Rule 1.10(a), that the entire firm of Schmittinger & Rodriguez may not do so either.

C.    Waiver

Plaintiffs assert that even if S&R's representation of them constitutes a conflict-of-

---

[8]*See, e.g.*, *Ramos v. Pabey*, 2005 WL 3556553, at *1-2, 5 (N.D. Ind. Dec. 27, 2005) (finding no conflict of interest for firm to represent terminated city employees after representing city for 27 years, due to intervening election; "any insight [the firm] gained into the city's employment-related activities . . . [or] into the city's litigation strategy was extinguished with the transition from the [former] administration to the [new] administration").

18

interest due to S&R's prior representation of the University, S&R should nonetheless be permitted to continue the current representations because Defendants waived their opportunity to object. Plaintiffs observe that after DSU wrote to S&R to raise the conflict issue with respect to Ozoemelam in October 2005, DSU did not raise the issue again until January 2008. By this time, S&R had represented Ozoemelam and Madukwe in multiple proceedings, within the University and before the Delaware Department of Labor. Plaintiffs also stress that DSU never explicitly advised S&R that the University believed the firm's representation of Madukwe was a conflict of interest.

"In determining whether the moving party has waived its right to object to the opposing party's counsel the court should consider the length of the delay in bringing a motion to disqualify, when the movant learned of the conflict, whether the movant was represented by counsel during the delay, why the delay occurred, and whether disqualification would result in prejudice to the nonmoving party." *Conley*, 431 F.Supp.2d at 499. When considering these factors under the totality of the circumstances present in this case, the Court concludes that while the University could -- and should -- have done more to preserve the conflict issue, Defendants have not waived their right to object to S&R's representation of Plaintiffs.

The University learned of S&R's conflict on October 20, 2006, when attorney Rodriguez joined Ozoemelam at her initial grievance proceeding at DSU. Within five days, the University wrote to Rodriguez to bring the conflict to his attention. However, after Rodriguez and Primos wrote back two days later to explain why S&R felt it had no conflict, the University and its attorneys did nothing further for over fourteen months. During this time both Plaintiffs continued to be represented by S&R. Only in January 2008, after answering Plaintiffs'

19

complaints, did DSU advise S&R that it believed the firm's representation of Ozoemelam and Madukwe were not permitted. Very shortly thereafter, in January and February 2008, Defendants filed their motions to disqualify. At that point – and still today – the case had not proceeded to discovery or even to scheduling.

DSU insists that the reason it waited from October 2006 until January 2008 to do anything more with the conflict issue was because S&R's letter denying a conflict "left little doubt that further entreaties for S&R to voluntarily withdraw would have been futile." CA 775, D.I. 50 at 1; CA 804, D.I. 32 at 1. Unless and until the disputes between Plaintiffs and the University reached a court, DSU had no mechanism to resolve the conflict issue; neither its internal grievance bodies nor the Department of Labor had authority to decide questions of representation. *See* CA 775, D.I. 51 at 29-31; CA 804, D.I. 33 at 29-31. DSU also asserts there was no reason "to believe that S&R's position would have been different with regard to [its] representation of Mr. Madukwe, which raised the exact same ethical considerations" as S&R's representation of Ozoemelam. CA 775, D.I. 50 at 1; CA 804, D.I. 32 at 1. Further, it appears likely that all sides were hopeful that the underlying issues between Plaintiffs and the University could be resolved without litigation, rendering the conflict of interest moot. *See* CA 775, D.I. 51 at 30, 34; CA 804, D.I. 33 at 30, 34.

It is clear that disqualification of S&R would prejudice Plaintiffs. As Primos has explained, "this would be a burden upon the Plaintiffs to now be told, after our firm having represented them for over a year and a half, I am sorry, you have to get other counsel." CA 775, D.I. 51 at 44-45; CA 804, D.I. 33 at 44-45. Undoubtedly, Plaintiffs have invested time and money in their representation by S&R. This factor alone, however, is not dispositive. *See Corn*,

20

748 F.2d at 162 (affirming disqualification of counsel despite recognition that it "would serve to increase the costs of litigation" for party losing its attorney). It is not entirely uncommon in cases like these for a client to be represented by one attorney during the pre-litigation phase of a case and by another attorney for the litigation itself. Additionally, the prejudice Plaintiffs will suffer here is somewhat reduced because the conflict issue has been raised at such an early point in the litigation. New counsel will be on board in time to set the case schedule and fully participate in discovery and all subsequent stages of the matter.

Weighing all five factors described in *Conley*, the Court concludes that there has not been a waiver. This conclusion is bolstered by the result in *Conley* itself. There, Chief Judge Sleet held that while defense counsel suffered from a conflict of interest, due to counsel's prior representation of the plaintiff, the plaintiff had waived her right to object to the conflict. But none of the considerations present in *Conley* are present here. In *Conley*, the plaintiff had earlier advised her former attorney that it was "okay" by her for the attorney to represent the defendant in the lawsuit. 431 F.Supp.2d at 500. By the time the plaintiff objected to the attorney's representation, nine months of litigation – including discovery – had already occurred. *See id.* at 499. Here, by contrast, there is no indication that DSU ever affirmatively advised S&R its representation of Plaintiffs was acceptable. DSU notified S&R within about a month after being served with the complaints that it would be moving for disqualification, and filed its motions to disqualify within approximately one more month. Again, neither discovery nor scheduling have yet begun.

Also supporting a finding of no waiver here is Judge Jordan's decision in *United States v. Gordon*, 334 F.Supp.2d 581 (D. Del. 2004). There, the United States Attorney's Office

("U.S.A.O.") had advised a defense attorney during a grand jury investigation that a County official under investigation required separate representation from the County itself. *See id.* at 583. Nonetheless, the attorney initially represented both the County official and the County. Thereafter, during nearly two years of grand jury investigation, the attorney continued to represent the County official. After the official was indicted, the attorney moved for admission *pro hac vice* to represent her in the ensuing criminal case.[9]

Judge Jordan found that the representation was prohibited by M.R.P.C. Rule 1.9 because it was substantially related to the attorney's prior representation of the County during the grand jury investigation that had resulted in the indictment against the County official. Among the arguments the defense attorney offered in his effort to remain in the case was delay: after the U.S.A.O. had raised the conflict of interest issue at the start of the attorney's participation in connection with the grand jury investigation, the U.S.A.O. had waited nearly two years – until after the indictment was returned – to raise the issue again. *See id.* at 584 (noting attorney "asserted that the United States stood silent for nearly two years during this investigation without asserting the position that he had a conflict based on his initial representation of the County").

Judge Jordan rejected this contention. It was sufficient that the U.S.A.O. had "raised the issue . . . in the very first conversation between the government and defense counsel two years" earlier, making it plain that the attorney "was well aware that this was an issue from the start." *Id.* at 597 & n.27. What was important was that the attorney was on notice of the problem, not

---

[9]*Gordon* was a criminal case and arose on a motion for admission *pro hac vice*. However, as Judge Jordan pointed out, the same Rule 1.9 applies in both civil and criminal contexts. *See* 334 F.Supp.2d at 585 n.7. Moreover, Judge Jordan treated the *Gordon* motion there as the functional equivalent of a motion for disqualification. *See id.* at 586.

whether additional efforts had been made to resolve the issue prior to the commencement of litigation. Here, too, S&R was indisputably on notice of DSU's position regarding the conflict, with respect to both Ozoemelam (via letter) and Madukwe (by operation of the same analysis set forth in DSU's letter regarding Ozoemelam), from the very beginning of the dispute between Plaintiffs and the University.

Therefore, the Court concludes that there has been no waiver here.[10]

## V. **CONCLUSION**

It gives me no satisfaction to disqualify any lawyer from a representation. However, for the reasons explained above, S&R is conflicted and DSU did not waive its right to object to that conflict. To the extent today's ruling works a financial or other hardship on Plaintiffs, those are costs that I deeply regret. But the University, as S&R's former client, also has a right to be treated in accordance with the Model Rules of Professional Conduct. The public and the Court, too, have expectations for attorney conduct, embodied in the Model Rules. These can, and must, be enforced.

Accordingly, for the reasons set forth in this Memorandum Opinion, Defendants' Motions to disqualify Plaintiffs' counsel (CA 775, D.I. 19; CA 804, D.I. 8) will be GRANTED. An appropriate order follows.

---

[10]Although I have concluded there was no waiver, and while I will be granting the motions to disqualify, I do not agree that there was nothing more the University should have done to press the conflicts issue. In order to avoid any possibility of good faith reliance by Plaintiffs on DSU's silence, it would have been far preferable for the University to have responded to Rodriguez and Primos' October 2006 letter, even just to say that the University was not persuaded. Even a verbal reiteration of the University's standing objection to S&R's representation in the course of one of the internal grievance hearings or Department of Labor proceedings would have eliminated any doubt that the conflict issue remained unresolved.

23

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CYRIL MADUKWE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 07-775-GMS-LPS |
| | : | |
| DELAWARE STATE UNIVERSITY, et al., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| ANGELE A. OZOEMELAM, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 07-804-SLR-LPS |
| | : | |
| DELAWARE STATE UNIVERSITY, et al., | : | |
| | : | |
| Defendants. | : | |

**ORDER**

At Wilmington this **5th** day of **May, 2008**, the Court having considered the parties'

briefing, supplemental briefing, and argument on Defendants' respective motions to disqualify

Plaintiffs' counsel (Case No. 07-775-GMS-LPS, D.I. 19-21, 31-33, 38-39, 49-51; Case No. 07-

804-SLR-LPS, D.I. 8-10, 15-17, 21-22, 31-33), and for the reasons set forth in the Memorandum

Opinion issued this same date,

IT IS HEREBY ORDERED that Defendants' motions to disqualify Plaintiffs' counsel are

GRANTED.

Honorable Leonard P. Stark
UNITED STATES MAGISTRATE JUDGE